# ALLEN *v.* SOUTHERN PACIFIC RAILROAD COMPANY.

## ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

No. 144. Argued January 17, 1899. — Decided April 3, 1899.

The sixth section of the act of March 3, 1891, c. 517, did not change the limit of two years as regards cases which could be taken from Circuit and District Courts of the United States to this court, and that act did not operate to reduce the time in which writs of error could issue from this court to state courts.

As a reference to the opinion of the Supreme Court of California makes patent the fact that that court rested its decision solely upon the construction of the contract between the parties to this action which forms its subject, and decided the case wholly independent of the Federal questions now set up; and as the decree of the court below was adequately sustained by such independent, non-Federal question, it follows that no issue is presented on the record which this court has power to review.

THIS suit, commenced by the Southern Pacific Railroad Company, (the defendant in error here,) against Darwin C. Allen, who is plaintiff in error, was based on eighty-four written contracts entered into on the first day of February, 1888. All these contracts were made exhibits to the complaint and were exactly alike, except that each contained a description of the particular piece of land to which it related. By the contracts the Southern Pacific Company agreed to sell and Darwin C. Allen to buy the land described in each contract upon the following conditions: Allen paid in cash a stipulated portion of the purchase price and interest at seven per cent in advance for one year on the remainder. He agreed to pay the balance in five years from the date of the contracts. The deferred payment bore interest at seven per centum per annum, which was to be paid at the end of each year. He moreover bound himself to pay any taxes or assessments which might be levied on the property. The contracts provided:

"It is further agreed that upon the punctual payment of said purchase money, interest, taxes and assessments, and the strict and faithful performance by the party of the second part, [Allen, the purchaser,] his lawful representatives or assigns, of all the agreements herein contained, the party of the first part [the Southern Pacific Company] will, after the receipt of a patent therefor from the United States, upon demand and the surrender of this instrument, execute and deliver to the party of the second part, his heirs and assigns, a grant, bargain and sale deed of said premises, reserving all claim of the United States to the same as mineral land."

There was a stipulation that the purchaser should have a right to enter into possession of the land at once, and by which he bound himself until the final deed was executed not to injure the property by denuding it of its timber. The contracts contained the following:

"The party of the first part [the Southern Pacific Company] claims all the tracts hereinbefore described, as part of a grant of lands to it by the Congress of the United States; that patent has not yet issued to it for said tracts; that it will

use ordinary diligence to procure patents for them; that, as in consequence of circumstances beyond its control, it sometimes fails to obtain patent for lands that seem to be legally a portion of its said grant, therefore nothing in this instrument shall be considered a guarantee or assurance that patent or title will be procured; that in case it be finally determined that patent shall not issue to said party of the first part for all, or any of the tracts herein described, it will, upon demand, repay [without interest] to the party of the second part all moneys that may have been paid to it by him on account of any of such tracts as it shall fail to procure patent for, the amount of repayment to be calculated at the rate and price per acre, fixed at this date for such tracts by said party of the first part, as per schedule on page 3 hereof; that said lands being unpatented, the party of the first part does not guarantee the possession of them to the party of the second part, and will not be responsible to him for damages, or costs, in case of his failure to obtain and keep such possession."

It was averred that after the execution of the contracts Allen, the purchaser, had entered into possession of the various tracts of land, and so continued up to the time of the commencement of the suit. The amount claimed was three annual instalments of interest on the deferred price which it was alleged had become due in February, 1889, 1890 and 1891. The prayer of the complaint was that the defendant be condemned to pay the amount of these respective instalments within thirty days from the date of decree, and in the event of his failure to do so that himself, his representatives and assigns, " be forever barred and foreclosed of all claim, right or interest in said lands and premises under and by virtue of said agreements, and be forever barred and foreclosed of all right to conveyance thereof, and that said contracts be declared null and void."

The defendant, whilst admitting the execution of the contracts, denied that he had ever taken possession of any of the land, and charged that the contracts were void because at the time they were entered into and up to the time of the institution of the suit the seller had no ownership or interest of any

kind in the land, and therefore that no obligation resulted to the buyer from the contracts. By way of cross-complaint it was alleged that the defendant had been induced to enter into the contracts by the false and fraudulent representations of the complainant that it had a title to or interest in the property; that, in consequence of the error of fact produced by these misrepresentations of the plaintiff, the defendant had paid the cash portion of the price and the interest in advance for one year on the deferred instalment; that, owing to the want of all title to or interest in the land on the part of the complainant, the defendant had been unable to take possession thereof, and that some time after the contracts were entered into the defendant had an opportunity to sell the land for a large advance over the amount which he had agreed to pay for it, which opportunity was lost in consequence of the discovery of the fact that the complainant had no title whatever to the property. The prayer of the cross-complaint was that the moneyed demand of the plaintiff be rejected; that the contracts be rescinded, and that there be a judgment against the plaintiff for the amount paid on account of the purchase price and for the damage which the defendant had suffered by reason of his failure to sell the property at an advanced price. The complainant put the cross-complaint at issue by denying that it had made any representations as to its title to or interest in the land except as stated in the contracts. It denied that at the time of the contracts it had no interest in the land, or that the defendant had been prevented from taking possession or had been prevented from selling at an advanced price because of a want of title.

Upon these issues the case was heard by the trial court, which made a specific finding of fact embracing, among other matters, the following: That the contracts sued on had been entered into as alleged and the instalments claimed thereunder were due despite demand; that no representations had been made by the plaintiff as to its title other than those which were recited in the contract; that the defendant had not lost the opportunity to sell at an advanced price, as alleged in the cross-complaint.

As to the title to the land embraced in the contracts, the facts were found to be as follows:

"That the lands and premises therein described were portions of the public domain of the United States and were granted to plaintiff by an act of the Congress of the United States, entitled 'An act granting lands to aid in the construction of a railroad and telegraph line from the States of Missouri and Arkansas to the Pacific coast,' approved July 27, 1866. That all of said lands, save sec. 5, in township 23 south, range 19 east, M. D. M., are situated within a belt more than 20 miles and less than 30 miles from plaintiff's railroad, generally known as the indemnity belt; the said sec. 5 being within 20 miles of said railroad.

"That the loss to plaintiff of odd-numbered sections within said granted limits, *i.e.*, within 20 miles of said railroad, because of the various exceptions and reservations in said act provided for, is fully equal to all the odd-numbered sections within said indemnity belt.

"That on March 19, 1867, an order was made by the Secretary of the Interior of the United States withdrawing or purporting to withdraw from sale or settlement under the laws of the United States, all of said lands situated in said indemnity belt; and that on August 15, 1887, another order was made by said Secretary of the Interior, revoking, or purporting to revoke, said first named order, and restoring said lands to the public domain for the usual sale and settlement thereof. The first said order of withdrawal is set forth in vol. — of 'Decisions of the Secretary of the Interior' at p. —, and the said second order in vol. 6 of said 'Decisions' at pp. 84–92; and which said orders as so set forth are here referred to, and made a part of this finding. That plaintiff is the owner of said lands in fee under the provisions of said act of Congress; that patents or a patent therefor have not yet been issued to plaintiff by the Government of the United States; that it has not been finally determined that patents or a patent shall not issue therefor, or for any part thereof, but proceedings are now pending before the proper Department of the Government of the United States, instituted by plaintiff, to obtain patents or

a patent for said lands and premises, and the whole thereof. That plaintiff has not been guilty of any want of ordinary diligence in instituting or prosecuting said proceedings to obtain said patents or patent." ·

There was a decree allowing the prayer of the complaint and rejecting that of the cross-complaint. On appeal the case was first heard in Department No. 1 of the Supreme Court of California, and the decree of the trial court was in part reversed. In accordance with the California practice the cause was transferred from the court in department to the court in banc, where the decree of the trial court was affirmed. 112 California, 455. To this decree of affirmance this writ of error is prosecuted.

*Mr. Wilbur F. Zeigler* for plaintiff in error. *Mr. Edward R. Taylor* filed briefs for same.

*Mr. Maxwell Evarts* for defendant in error. *Mr. William F. Herrin* was on his brief.

Mr. Justice White, after making the foregoing statement, delivered the opinion of the court.

It is asserted that the record is not legally in this court because the writ of error was allowed by the Chief Justice of the State after the expiration of the time when it could have been lawfully granted. It was allowed within two years of the decree by the state court, but after more than one year had expired. The contention is that writs of error from this court to the courts of the several States cannot now be lawfully taken after the lapse of one year from the final entry of the decree or judgment to which the writ of error is directed.

This rests on the assumption that the act of March 3, 1891, c. 517, 26 Stat. 826, not only provides that writs of error or appeals in cases taken to the Supreme Court from the Circuit Courts of Appeals created by the act of 1891, shall be limited to one year, but also fixes the same limit of time for writs of error or appeal in cases taken to the Supreme Court from the

Circuit and District Courts of the United States, thereby repealing the two years' limitation as to such Circuit and District Courts previously established by law.    Rev. Stat. § 1008.    As this asserted operation of the act of 1891 produces a uniform limit of one year for writs of error or appeals as to all the courts of the United States, in so far as review in the Supreme Court is concerned, the deduction is made that a like limit necessarily applies to writs of error from the Supreme Court to state courts, since such state courts are, Rev. Stat. § 1003, subject to the limitation governing judgments or decrees of "a court of the United States."    The portion of the act of 1891 from which it is claimed the one year limitation as to writs of error and appeal from the Supreme Court to all courts of the United States arises is the last paragraph of section 6 of that act.    The section of the act in question in the portions which precede the sentences relied upon, among other things, defines the jurisdiction of the Circuit Courts of Appeals established by the act of 1891, and determines in what classes of cases the jurisdiction of such courts is to be final. After making these provisions the concluding part of section 6 provides as follows:

"In all cases not hereinbefore, in this section, made final, there shall be of right an appeal or writ of error or review of the case by the Supreme Court of the United States where the matter in controversy shall exceed one thousand dollars besides costs.    But no such appeal shall be taken or writ of error sued out unless within one year after the entry of the order, judgment or decree sought to be reviewed."

It is apparent that the language just quoted relates exclusively to writs of error or appeal in cases taken to the Supreme Court from the Circuit Courts of Appeals.    The statute, in the section in question, having dealt with the jurisdiction of the Circuit Courts of Appeals and defined in what classes of cases their judgments or decrees should be final and not subject to review, follows these provisions by conferring on the Supreme Court the power to review the judgments or decrees of the Circuit Courts of Appeals, not made final by the act.    To construe the section as relating to or controlling the review by

error or appeal, by the Supreme Court, of the judgments or decrees of Circuit or District Courts of the United States, would not only disregard its plain letter but do violence to its obvious intent. Relating only, then, to writs of error or appeal from the Supreme Court to the Circuit Courts of Appeals, it follows that the limitation of time, as to appeals or writs of error, found in the concluding sentence, refers only to the writs of error or appeal dealt with by the section and not to such remedies when applied to the District or Circuit Courts of the United States, which are not referred to in the section in question. This is made manifest by the statement, not that all appeals or writs of error to the Supreme Court from all the courts of the United States shall be taken in one year, but that "no such appeal shall be taken unless within one year," etc. If these words of limitation were an independent and separate provision of the act of 1891, thereby giving rise to the implication that the words "no such appeal or writ of error" qualified and limited every such proceeding anywhere referred to in the act of 1891, the contention advanced would have more apparent force. As, however, this is not the case, and as, on the contrary, the words "no such appeal or writ of error" are clearly but a portion of section 6, it would be an act of the broadest judicial legislation to sever them from their connection in the act in order to give them a scope and significance which their plain import refutes, and which would be in conflict with the meaning naturally begotten by the provision of the act with which the limitation as to time is associated. Nor is there anything in section 4 of the act of 1891, destroying the plain meaning of the words "such appeal or writ of error," found in the concluding sentence of section 6. The language of section 4 is as follows:

"All appeals by writ of error or otherwise, from said District Courts, shall only be subject to review in the Supreme Court of the United States or in the Circuit Court of Appeals hereby established, as is hereinafter provided, and the review, by appeal, by writ of error or otherwise, from the existing Circuit Courts shall be had only in the Supreme Court of the United States or in the Circuit Courts of Appeals hereby es-

tablished according to the provisions of this act regulating the same."

This section refers to the jurisdiction of the courts created by the act of 1891, and to the changes in the distribution of judicial power made necessary thereby. If the concluding words of section 4, "according to. the provisions of this act regulating the same," were held to govern the time for writs of error or appeal to the Supreme Court from the District or Circuit Courts of the United States, the argument would not be strengthened, since there is no provision in the act governing the time for such writs of error or appeal. The contention that Congress cannot be supposed to have intended to fix two distinct and different limitations for review by the Supreme Court, one of two years as to the Circuit and District Courts of the United States, and the other of one year as to the Circuit Courts of Appeals, affords no ground for disregarding the statute as enacted, and departing from its unambiguous provi-. sions upon the theory of a presumed intent. of Congress. Indeed, if it were conceded that the provisions of section 4 referred to the procedure or limit of time in which appeals or writs of error could be taken, in cases brought to the Supreme Court, from the Circuit or District Courts of the United States, such concession would be fatal to the contention which we are considering, for this reason. The concluding portion of section 5 of the act of 1891 is as follows:

"Nothing in this act shall affect the jurisdiction of the Supreme Court in cases appealed from the highest court of a State, nor the construction of the statute providing for review of such cases."

Whilst this language clearly relates to jurisdictional power and not to the mere time in which writs of error may be taken, yet the same reasoning which would impel the concession that section 4 related to procedure and not to jurisdictional authority would give rise to a like conclusion as to the provision in section 5 just quoted. It follows, therefore, that the only reasoning by which it is possible to conclude that the act of 1891 was intended to change the limit of time in which writs of error could issue from the Supreme Court to the Cir-

cuit or District Courts, or in which appeals could be taken from
such courts to the Supreme Court, would compel to the con-
clusion that the act of 1891 had expressly preserved the two
years' limitation of time then existing as to writs of error from
state courts to the Supreme Court.

From the conclusion that the sixth section of the act of 1891
did not change the limit of two years as regards the cases
which could be taken from the Circuit and District Courts of
the United States to the Supreme Court, it follows that the
act of 1891 did not operate to reduce the time in which writs
of error could issue from the Supreme Court to the state courts.
That period was two years, in analogy to the time limit estab-
lished by statute with reference to writs of error to the District
and Circuit Courts of the United States, which courts, at the
time of the passage of the act of 1891, answered to the desig-
nation of "a court of the United States" contained in section
1003 of the Revised Statutes, regulating the subject of writs
of error to state courts. The circumstance that Congress, in
creating a new court of the United States, affixed a different
limitation as to the time for prosecuting error to such court
and left unchanged the limitation as to the time within which
error might be prosecuted to the courts whose practice in
this particular governed the practice in state courts, irresistibly
warrants the inference that it was intended that the practice
in the state courts as to the time of suing out writs of error
should continue unaltered. The writ of error in this case
having been allowed within two years from the final decree,
was therefore seasonably taken.

We are brought, then, to consider whether there arises
on the record a Federal question, within the intendment of
Rev. Stat. § 709. The claim is that two distinct Federal
issues are presented by the record or are necessarily involved
therein. They are: First. That by a proper construction of
the act of Congress granting land to the railroad, 14 Stat.
292, no title to lands which were beyond the place limits, but
in the indemnity limits, passed to the railroad until approved
selections of such lands had taken place, hence that it was not
only drawing in question the validity of an authority exercised

under the United States, but also denying a privilege or immunity claimed under the statute of the United States to decide that the railroad had, before such approved selection, any right to contract to sell the lands in question.    Second. That it was drawing in question the validity of an authority exercised under a law of. the United States, and denying a privilege or immunity claimed under such law to hold that the right of the railroad to the lands in question had not been irrecoverably adversely determined by the action of the Secretary of the Interior, revoking his previous action withdrawing such lands, even although, at the time of such cancellation of the prior general withdrawal, there were pending in the Land Department claims of the railroad to the land in question which at that time were not finally disposed of.

Conceding *arguendo* only that the contentions thus advanced would give rise to the Federal questions as claimed, it becomes wholly unnecessary to consider them if it be disclosed by the record that the state court rested its decision upon grounds wholly independent of these contentions, and which grounds are entirely adequate to sustain the judgment rendered by the state court without considering the Federal questions asserted to arise on the record.    *McQuade* v. *Trenton,* 172 U. S. 636; *Capital Bank* v. *Cadiz Bank,* 172 U. S. 425.

In inquiring whether this is the case we are unconcerned with the conclusions of the trial court, or with those of a department of the Supreme Court of California, and consider only the final action of the Supreme Court of the State in disposing of the controversy now before us.    A reference to the opinion of the Supreme Court of California makes patent the fact that that court rested its decision solely upon a construction of the contract, and therefore that it decided the case upon grounds wholly independent of the Federal questions now claimed to be involved.    The court held that the contract disclosed that both parties dealt with reference to the existing state of the title to the lands, the vendor selling his hope of obtaining title and the vendee buying such expectation; that the result of the contract was that the vendor in advance agreed to sell such title, if any, as he might obtain

in the future, and that the vendee agreed for the sake of obtaining in advance the right to the title, if the vendor could procure it, to pay the amount agreed upon, subject to the return of the price in the event it should be finally determined that the hope of title in the vendor, as to which both parties were fully informed, should prove to be illusory. On these subjects the court said:

"The defendant further contends that the contracts were void *ab initio*, for want of mutuality or consideration, or amounted at most to mere offers to purchase on his part. This contention cannot be sustained. Plaintiff claimed title to these lands, but its title had not been perfected by patent. Defendant had the same opportunity as plaintiff of knowing the nature and probable validity of that claim. Under these circumstances plaintiff agreed to convey to defendant when it should obtain a patent, and to permit defendant to enter into possession of the land at once. In consideration of these premises defendant agreed to purchase when a patent should be issued, paid at once one fifth of the purchase price and one year's interest on the balance, and agreed to pay the remainder (with interest thereon annually in advance) on or before a given date, with the right to a repayment without interest in the event of an ultimate failure to obtain a patent. These promises were strictly mutual, and each constituted a sufficient consideration for the other. Plaintiff by its contract surrendered its right to contract with or sell to any one else, and yielded to defendant the present right to possession which it claimed. These concessions were clearly a detriment to plaintiff, and, in a legal sense, an advantage to defendant; and they, therefore, furnish a consideration for defendant's promise to pay."

Upon the question of the final determination of the hope of title upon which the return of the price was by the contract made to depend, the court concluded as follows:

"The only question really involved in the case is as to the construction of the contracts sued upon. It is contended by the defendant that he was under no obligation to purchase the land or to pay the remainder of the purchase price, unless the

plaintiff should, *within the five years,* obtain a patent for the land; and that, as the plaintiff had failed to obtain a patent within that time, and as the action was not tried until after the expiration of that time, the defendant was entitled to a rescission of the contract. But clearly the contracts will not bear any such construction. The defendant contracted unconditionally to pay the remainder of the purchase price 'on or before' a certain day named, and to pay interest annually in advance on the remainder; but the plaintiff contracted to convey to defendant only 'upon the receipt of a patent,' and was to repay the money only 'in case it be *finally determined* that patent shall not issue.' The defendant, therefore, was not entitled to terminate the contract or to require a repayment of the moneys paid, until the question of the issue of a patent to the plaintiff should be 'finally determined.' The findings state that proceedings are now pending in the United States Land Department for the issue of patent to the plaintiff, and that it has not been finally determined that such patent shall not issue. At the time, therefore, at which defendant contracted to pay the balance of the purchase price, plaintiff was not in default, nor was it in default at the time of the trial."

We cannot say that the state court has erroneously construed the act of Congress, since its decree rests alone upon the conclusion reached by it, that by the contracts between the parties there existed a right to recover whatever may have been the existing state of the title. The conclusion that the parties were competent to contract with reference to an expectancy of title involved no Federal question. The decision that the final determination of title, referred to in the contracts, related to the proceedings in the Land Department which were pending at the time the contracts were entered into and not to the cancellation by the Secretary of the Interior of the withdrawal order, which had been made by that officer before the date of the contracts, precludes the conception that the state court erroneously denied the legal consequence flowing from the order of withdrawal. It follows then that as the decree of the court below was adequately

sustained by an independent non-Federal question, there is no issue presented on the record which we have the power to review, and the cause is therefore

*Dismissed for want of jurisdiction.*